*10479122276*

IN THE DISTRICT COURT IN AND FOR
TULSA COUNTY STATE OF OKLAHOMA

| | | |
|---|---|---|
| DEIBY H. REVILLA GUERRERO,<br>as Special Administrator of the Estate of<br>Bridget Nicole Revilla, deceased | )<br>)<br>)<br>) | **CJ-2020-3333**<br>WILLIAM MUSSEMAN |
| Plaintiff, | ) | Case No.: |
| v. | )<br>) | |
| CORRECTIONAL HEALTHCARE<br>COMPANIES, INC., | )<br>)<br>) | Attorney's Lien Claimed<br>DISTRICT COURT<br>FILED |
| Defendant. | )<br>) | OCT 29 2020<br>DON NEWBERRY, Court Clerk<br>STATE OF OKLA. TULSA COUNTY |

## PETITION[1]

COMES NOW the Plaintiff, and for his causes of action against the Defendant, alleges and states as follows:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff is a resident of Tulsa County, Oklahoma, and the duly-appointed Special Administrator of the Estate of Bridget Nicole Revilla ("Ms. Revilla").

2. Defendant Correctional Healthcare Companies, Inc. ("CHC") is a foreign corporation, that was, at all times pertinent hereto, doing business in Tulsa County, Oklahoma. CHC was, at all times relevant hereto, responsible for providing medical and mental health care services and medication to Ms. Revilla while she was in the custody of the Tulsa County Sheriff's

---

[1] This Petition is timely submitted for filing within 30 days of the United States District Court for the Norther District of Oklahoma's dismissal without prejudice for lack of supplemental jurisdiction of the State law claims. *See* 28 U.S.C. § 1367(d) ("The period of limitations for any claim asserted under [supplemental jurisdiction] ..., shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."); *see also Wittner v. Banner Health,* 720 F.3d 770, 781 (10th Cir. 2013) (explaining that after a court declines to exercise supplemental jurisdiction over a plaintiff's state law claims, the plaintiff has 30 days to refile the claims in state court).

1

**EXHIBIT 1**

Office ("TCSO"). CHC was additionally responsible, in part, for creating and implementing policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Tulsa County Jail, and for training and supervising its employees.

3. CHC has the requisite "minimum contacts" with the State of Oklahoma for jurisdiction to be proper in this Court.

4. Venue is proper because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

5. On June 19, 2012, Ms. Revilla was booked into the Tulsa County Jail. CHC was the private medical contractor, responsible for providing adequate medical and mental health care to all inmates housed at the Jail, including Ms. Revilla.

6. Upon being booked into the Jail, Ms. Revilla filled out, or was assisted in filling out, several forms. On the TRACIS screening form, an officer indicated that Ms. Revilla had an "ID bracelet for medical problems", including seizure disorder.

7. A Mental Health Screening Form filled out for Ms. Revilla on June 18 indicates that she was ***thinking about killing herself***, had tried to kill herself in the past, was feeling paranoid or hearing voices, had been nervous or depressed for weeks and had previously been hospitalized for mental health problems. According to the TCSO's own form, Ms. Revilla's answers should have prompted a mental health referral. However, there is no indication that such a referral was made. Rather, inexplicably, and in neglect of her serious mental health needs, a "General Information" form filled out for Ms. Revilla by TCSO staff on June 18 indicates that *she did not require special management* for mental health reasons nor require segregation from the general population.

2

8.     A medical note "updated" by CHC booking nurse Faye Taylor on June 19 indicates that Ms. Revilla was *presently suicidal and "burned out on life."* This note again indicated that Ms. Revilla suffered from "seizure disorder". Notably, Ms. Revilla was purportedly placed on *"suicide watch"* at around 12:30 p.m. on *June 19, 2012.*

9.     Under TCSO "Post Order #8," when an inmate on suicide watch is placed in the medical unit, the medical unit officer shall conduct health and welfare checks *"at least every 15 minutes"* and the inmate is to have all clothing removed and be provided with only a paper gown and suicide blanket. CHC Clinical Protocols similarly require continuous monitoring, or at least observation every 15 minutes, of suicidal or *potentially suicidal* inmates. *"Security must take precaution to 'suicide proof' all [suicide watch] cells."* Such precautions include the removal of all items "including *sheets, blankets, mattresses or any loose items which can be utilized as a suicide weapon...."* The evidence in this case is that, despite Ms. Revilla being placed on suicide watch, the requirements of Post Order 8 and CHC Clinical Protocol L13 were not observed.

10.    A "security check form" for Ms. Revilla shows that she had no fewer than seven (7) seizures in her cell on June 21, 2012. According to Ms. Revilla, Jail medical staff was providing her with three times the amount of Dilantin she was supposed to be given. Dr. Andy Adusei, a CHC employee acting within the scope of his employment, prescribed 600mg of Dilantin a day, despite indications that 400mg was the maximum daily dose. On June 21, the level of Dilantin in Ms. Revilla's blood level was "supra-therapeutic," or was well in excess of the "reference level." Yet, despite concerns being raised again in mid-July 2012 regarding Ms. Revilla's Dilantin levels, her levels had not been checked from June 23 through *August 12*, when Dr. Adusei and Dr. Harnish, CHC's Jail psychiatrist, noted continuing concerns about *Dilantin toxicity*.

3

11. The excessive dosage of Dilantin made Ms. Revilla feel drunk and she began to experience "blackouts." Ms. Revilla notified Jail medical staff that she was experiencing these symptoms as early as June 21, 2012. Lastly, Ms. Revilla's vital signs were not taken on June 21, in violation of CHC's infirmary care Clinical Protocol.

12. At 12:01 a.m. on June 22, 2012, Ms. Revilla experienced yet another seizure. At 7:31 a.m., Patricia Benoit, an employee of CHC acting within the scope of her employment, documented a "mental health" visit. Specifically, Ms. Benoit noted that Ms. Revilla did *"not respond to repeated calling of her name"*/ was "not responsive to her name being called...." CHC Clinical Protocols provide that where an inmate is found unresponsive, medical staff is required to: (1) have the Officer call 911 to request an Emergency Ambulance; (2) begin CPR, apply AED, if available; (3) notify the provider on call; and (4) document in patient's chart. Yet, aside from documenting the unresponsiveness in Ms. Revilla's chart, it does not appear that Ms. Benoit followed any of the other requirements of the Clinical Protocol. Ms. Revilla's vital signs were not taken on June 22, in violation of CHC's infirmary care Clinical Protocol.

13. On June 23, 2012, it was noted by Nurse Karen Metcalf, a CHC employee acting within the scope of her employment, that blood was drawn from Ms. Revilla to check her Dilantin level. *Months later*, on August 12, 2012, it was noted that Ms. Revilla's Dilantin level on June 23 was 28.3, raising concerns about *"potential toxicity."* Ms. Revilla had *another seizure* on June 23. Further, Ms. Revilla's vital signs were not taken on June 23, in violation of CHC's infirmary care Clinical Protocol.

14. On June 25, 2012, at 10:01 a.m., John Bell, a non-physician member of the CHC's "mental health team," reports that Ms. Revilla was *"being combative with security staff* when they were trying to take her to a pod" and the security staff *requested* that she have a *mental health*

4

*evaluation* before being moved to a segregation unit. Nevertheless, there is no record that Ms. Revilla was given any mental health "assessment" until June 27, 2012, *after* her first *suicide attempt* at the Jail. Further, there is *no record* that Ms. Revilla was *ever* seen by Dr. Harnish, the Jail's only psychiatrist.

15.     At 10:57 a.m. on June 25, Nurse Monique Howard, a CHC employee acting within the scope of her employment, entered the following note into Ms. Revilla's medical chart: "Inmate voiced that she *felt drunk* and it was noted that inmate han [sic] an *unstaedy [sic] gate*. Inmate has an order for Dilatin 600mg po bid. Inmate had Dilatin level drawn on *6/21/2*102 and results showed that her level was at *28.3ml* with a *reference range of 10-20 ml*. Inmate will have Dilantin level re-drawn. Inmate will be scheduled to see Dr. Auduesi [sic] today during rounds." 30 mcg/ml is a toxic Dilantin level. Nonetheless, despite the plan to re-test Ms. Revilla's Dilantin level, her Dilantin levels were not checked from June 23 through *August 12*, when Drs. Adusei and Harnish noted continuing concerns about *Dilantin toxicity*.

16.     At around 7:30 p.m. on June 25, Nurse Marchelle Brown-Suntken, a CHC employee acting within the scope of her employment, was making rounds in the medical unit and noticed Ms. Revilla "did not respond to her knocking on the [cell] window...." Nurse Brown-Suntken then observed that something was tied around Ms. Revilla's neck. Brown-Suntken entered the cell and began CPR. When Nurse Dena Spencer and Nurse Howard next entered the cell, they found Ms. Revilla *"had tied a sheet with triple knots twice around her neck."* After additional CPR efforts, Ms. Revilla had "some spontaneous respirations," and CPR was taken over by EMSA and Tulsa Fire at 7:40 p.m. Ms. Revilla was transported to Saint John Hospital at approximately 7:55 p.m.

17. Ms. Revilla was purportedly placed on "suicide watch" on June 19, 2012. And there is no indication, anywhere in the medical record, that she was taken off of suicide watch by a mental health professional. Under CHC Clinical Protocol L13, Ms. Revilla should not have been given access to bed sheets or other items that "can be utilized as a suicide weapon...."

18. Upon Ms. Revilla's return to the Jail's medical unit, on June 27, 2012, Nurse Julie Hightower filled out an "Infirmary Admission Record" indicating that Ms. Revilla was to ***"remain[]" on suicide watch.*** This is additional evidence that Ms. Revilla was, in fact, never taken off of suicide watch from June 19 through June 25, 2012. Nonetheless, despite remaining on suicide watch, and the obvious dangers of self-harm, responsible personnel at the Jail utterly failed, in violation of applicable policies and protocols, to take measures to protect Ms. Revilla.

19. Video in the facility shows that at 11:18 a.m., Deputy Foster brought Ms. Revilla back to the Jail through booking on June 27. According to TCSO's own investigation, when Ms. Revilla walked through the sliding doors and into booking, there was a visible ***"blue Coban[] on her right wrist."*** As TCSO admits, the blue Coban ***"was not taken or removed."*** At 11:34 a.m., Ms. Revilla was handcuffed by Deputy Gwinn and transported to medical. At this time, the blue Coban was on Ms. Revilla's wrist and remained visible on the surveillance video. At 11:36 a.m., Deputy Gwinn and Ms. Revilla arrived in the medical unit; Deputy Gwinn removed the handcuffs from Ms. Revilla; the ***blue Coban "was still on her right wrist."*** Deputy Gwinn did not remove the blue Coban.

20. From 11:36 to 11:50 a.m., Ms. Revilla sat against the South wall in the medical unit, next to the hall and officers' station. During this interval, the ***blue Coban remained outwardly and visibly on Ms. Revilla's wrist.*** At 11:42 a.m., Mr. Bell, of the "mental health team," sat down and spoke with Ms. Revilla; ***Mr. Bell failed to remove the blue Coban from her wrist.***

6

From 11:44 to 11:50 a.m., Nurse Howard took Ms. Revilla's vital signs; *Nurse Howard checked the blue Coban but failed to remove it from Ms. Revilla's wrist.*

21. According to TCSO, at 11:53 a.m., Ms. Revilla entered her cell in the medical unit. Upon entering her cell, Ms. Revilla passed several officers with the *blue Coban still on her wrist.* From 12:05 to 1:29 p.m., the Jail cell video shows Ms. Revilla pulling and stretching the blue Coban, and, at various points, taking the Coban off of her wrist. At 1:29 p.m., Dr. Adusei entered Ms. Revilla's cell; the blue Coban was no longer on her wrist. In a medical note from June 27, Dr. Adusei acknowledged that Ms. Revilla had attempted to kill herself by hanging and assessed her as "suicide attempt."

22. From 1:40 to 2:00 p.m., the Jail's video surveillance system shows Ms. Revilla "mess[ing] with the blue Coban[], *sometimes trying it on her neck."* Not one detention officer or medical staff member intervened. At 2:01 p.m., the surveillance video shows Ms. Revilla stretching the blue Coban "enough to go *around her neck* and … trying to find a way to tie it." Again, no one at the Jail intervened. By 2:14 p.m., Ms. Revilla had *"tied the blue Coban[] around her neck, her face was red, and she appeared to be coughing* a little and flung her arms out." Ms. Revilla had attempted to hang herself using the Coban. At 2:18 p.m., a detention officer, Officer Gilbert, *finally* opened the cell door and Medical staff attempted to treat her.

23. Now, Ms. Revilla had attempted suicide twice in two days at the Jail. And each suicide attempt was eminently preventable. Plainly, security staff had not been providing welfare checks every 15 minutes, as required by policy, and both detention and medical staff had failed to remove the blue Coban, which was a *"loose item[]"* that could be, and was, *"utilized as a suicide weapon...."*

7

24. Even after this second suicide attempt, *Ms. Revilla did not see Dr. Harnish, the Jail's lone psychiatrist, and was not referred to an outside mental health facility.*

## CAUSE OF ACTION

### NEGLIGENCE

25. Paragraphs 1-24 are incorporated herein by reference.

26. CHC is vicariously liable for the acts of its employees and/or agents under the doctrine of *respondeat superior*.

27. CHC, through its employees and/or agents at the Tulsa County Jail, owed a duty to Ms. Revilla, and all other inmates incarcerated at the Tulsa County Jail, to provide medical and mental health assistance with reasonable care, taking caution not to cause additional harm during the course of treatment.

28. As described herein, CHC, through its employees and/or agents, breached their duty to Ms. Revilla by failing to provide competent medical and mental health care and treatment as required by applicable standards of care, custom and law.

29. This negligence was the direct and proximate cause of Ms. Revilla's injuries and damages, including physical and emotional pain and suffering.

30. Plaintiff is entitled recover damages on behalf of Ms. Revilla's Estate.

WHEREFORE, based on the foregoing, Plaintiff prays this Court grants him the relief sought, including but not limited to compensatory damages in amounts to be determined at trial, with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

/s/ Daniel E. Smolen
Daniel E. Smolen, OBA #19943
danielsmolen@ssrok.com
Robert M. Blakemore, OBA #18656
bobblakemore@ssrok.com
SMOLEN & ROYTMAN
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone: (918) 585-2667
Fax: (918) 585-2669

***ATTORNEYS FOR PLAINTIFF***